**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS MCDONALD; MARIAN
MCDONALD; ALEX E. MCDONALD,
     *Plaintiffs-Appellants,*

v.

SUN OIL COMPANY; SUNOCO, INC.;
CORDERO MINING COMPANY; J.T.
BATTERSON; SUSAN BATTERSON,
     *Defendants-Appellees.*

No. 06-35683

D.C. No.
CV-03-01504-ALH

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
July 10, 2007—Portland, Oregon

Filed November 19, 2008

Before: Harry Pregerson and Stephen Reinhardt,
Circuit Judges, and Lyle E. Strom, District Judge.*

Opinion by Judge Strom

*The Honorable Lyle E. Strom, Senior United States District Judge for
the District of Nebraska, sitting by designation.

15507

**COUNSEL**

Brooks Foster (argued) and Brian D. Chenoweth, Chenoweth Law Group, Portland, Oregon, for the plaintiffs-appellants.

Harold L. Segall (argued), James T. Esselman and Leah A. Dundon, Beveridge & Diamond, P.C., Washington, District of Columbia, for the defendants-appellees.

## OPINION

STROM, District Judge:

Thomas McDonald, Marian McDonald and Alex McDonald appeal from the district court's grant of summary judgment in favor of Sun Oil Company, Sunoco, Inc. and Cordero Mining Company (collectively, "Sun"). The McDonalds sued Sun for, among other things, negligence, contribution, breach of contract and fraud. Each of these claims arose out of an alleged oral warranty that certain crushed rock at the Horse Heaven Mine Property ("Horse Heaven"), a disused mercury mine, was free of mercury. The district court held that Oregon's statute of repose barred the McDonalds' negligence claim, that their claim for contribution failed to comply with an administrative requirement, that their breach of contract claim failed because of the merger doctrine and the parol evidence rule, and that their fraud claim failed to raise a genuine issue of material fact. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand for trial.

## I. BACKGROUND

In 1934, Ray Whiting Jr. and Harry Hoy developed the Horse Heaven Mine and operated it until 1936. From 1936 to 1973, the mine was owned and intermittently operated by Sun. Sun permanently ceased mining operations at Horse Heaven in 1958. In 1973, among over 2,600 acres of property in Jefferson County, Oregon, Sun conveyed Horse Heaven to Thomas and Marian McDonald via a bargain and sale deed. In the deed conveying the property to the McDonalds, Sun reserved "all of the oil, gas, and other mineral rights" in the property to itself, but specifically excluded rights to "surface materials which are used for road-building or construction purposes, such as . . . calcine . . . except such quantities as are reasonably used or useful in the enjoyment of [Sun's] reserved rights." (ER 51.) At the time of this purchase, the

Horse Heaven property contained a large pile or piles of calcine tailings.

Calcine is a waste product resulting from the processing of mercury ore into mercury. Mercury sulfide ore is mined, crushed, and heated in a furnace or "retort" to separate mercury from the ore. After the heating process is complete, the crushed rock, now called calcine, is stockpiled. At Horse Heaven, the calcine tailings were deposited in a pile or piles on the surface of the property surrounding the mine. Some mercury still remains in the calcine at Horse Heaven. However, the parties dispute the amount and potential harmfulness of the remaining mercury.

Prior to the 1973 sale of the property, Thomas McDonald met with Ray Whiting and Sun's Wally Freeman at the mine to discuss the potential sale. In his deposition, McDonald testified that while they were standing on the calcine pile prior to the sale, Freeman told him that because the "retort" process extracted mercury and other heavy metals from the ore, there was no mercury in the calcine. During that same conversation, McDonald told Freeman that he intended to use the calcine for road construction or to sell it commercially as decorative rock.

In 1976, the McDonalds sold all the Jefferson County property except for the forty acres comprising the former Horse Heaven mine. In 1982, the McDonalds transferred these forty acres to Ray Whiting and his wife. Whiting later conveyed his interest in the property to his daughter and grandson. The deed to Whiting reserved to McDonalds the rights to the calcine tailings until 2007. On several occasions, Mr. McDonald brought some of the calcine to his personal residence and placed it on his driveway and parking lot.

In 2001, the Oregon Department of Environmental Quality ("DEQ") requested information regarding possible contamination at Horse Heaven, and in 2002 determined that the

McDonalds' handling of the calcine tailings had created an environmental release. The McDonalds were then ordered to refrain from removing or disturbing the calcine piles at Horse Heaven without DEQ approval. The McDonalds allege that they did not learn that the calcine was potentially contaminated until 2001.

On August 25, 2003, the McDonalds sued Sun in Oregon state court. On November 3, 2003, Sun removed the case to the United States District Court for the District of Oregon. On March 14, 2006, the district court granted summary judgment against the McDonalds on all their claims. This appeal followed. The McDonalds appeal only the district court's rulings granting summary judgment to Sun on their negligence, contribution, contract, and fraud claims.

## II.  STANDARD OF REVIEW

This Court reviews "*de novo* a district court's decision to grant summary judgment. We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Del. Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1119 (9th Cir. 2008) (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc)). "A factual dispute is genuine only if a reasonable trier of fact could find in favor of the nonmoving party. A mere scintilla of evidence supporting a nonmovant's position is insufficient to withstand summary judgment." *In re Ahaza Sys., Inc.*, 482 F.3d 1118, 1128 (9th Cir. 2007) (quoting *Galen v. County of L.A.*, 468 F.3d 563, 568 (9th Cir. 2006)).

### III.   DISCUSSION

## A.   NEGLIGENCE

The district court granted Sun's motion for summary judgment on the McDonalds' negligence claim, holding that the claim is barred by Oregon's statute of repose for negligent injury to person or property, Or. Rev. Stat. § 12.115(1). The McDonalds argue that the court below erred in applying the Oregon statute because Section 309 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, 42 U.S.C. § 9601-9675, grafts a discovery rule onto state statutes of limitations.[1] We agree. The dis-

---

[1]42 U.S.C. § 9658 (CERCLA § 309) provides:

  (a)   State statutes of limitations for hazardous substance cases

    (1)   Exception to State statutes

    In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

. . .

  (b) Definitions

. . .

    (2)   Applicable limitations period

    The term "applicable limitations period" means the period specified in a statute of limitations during which a civil action referred to in subsection (a)(1) of this section may be brought.

    (3)   Commencement date

    The term "commencement date" means the date specified in a statute of limitations as the beginning of the applicable limitations period.

    (4)   Federally required commencement date

      (A)   In general

trict court held that CERCLA § 309 does not apply because § 12.115(1) is a statute of repose, not a statute of limitations. However, the term "statute of limitations" in CERCLA § 309 is ambiguous and the legislative history of the section indicates that its meaning includes statutes of repose like § 12.115(1).

**[1]** Statutes of limitations and repose are distinct legal concepts with distinct effects. "A statute of limitations requires a lawsuit to be filed within a specified period of time after a legal right has been violated . . . . On the other hand, statutes of repose are designed to bar actions after a specified period of time has run from the occurrence of some event other than the injury which gave rise to the claim." *Raithaus v. Saab-Scandia of America, Inc.*, 784 P.2d 1158, 1160 (Utah 1989). Statutes of limitations

> preclude[ ] the plaintiff from proceeding, . . . the right (moral or legal) goes on, but the plaintiff simply cannot go to court in order to enforce it . . . . A statute of repose, however, has a more substantive effect because it can bar a suit even before the cause of action could have accrued, or, for that matter, retroactively after the cause of action has accrued. In proper circumstances, it can be said to destroy the right itself. It is not concerned with the plaintiff's diligence; it is concerned with the defendant's peace.

*Underwood Cotton Co., Inc. v. Hyundai*, 288 F.3d 405, 408-09 (9th Cir. 2002) (internal citations omitted) (referring to the distinctions between the two types of statute as "arcane").

> Except as provided in subparagraph (B), the term "federally required commencement date" means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.

**[2]** The difference is manifest in Oregon's statutory scheme. For example, Or. Rev. Stat. § 12.110(1), not at issue in this case, is a statute of limitations, providing that "[a]n action for any injury to the person or rights of another, not arising on contract . . . shall be commenced within two years . . . ." Under this statute, it is evident that injury must be experienced before the time limit starts to run because an action cannot be commenced until after the injury element of the *prima facie* case is satisfied. However, the statute of repose at issue here, Or. Rev. Stat. § 12.115(1), states that "[i]n no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of." This statute does not require injury before it operates. Therefore, if § 12.115(1) applies to the nearly thirty year old negligence claim in this case, and § 309 does not operate to impose a discovery rule upon it, that claim is barred.

### 1.  Plain Meaning vs. Ambiguity

The first step in construing the meaning of a statute is to determine whether the language at issue has a plain meaning. "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.' Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal citations omitted). It should not be "presum[ed] that 'the legislature was ignorant of the meaning of the language it employed.' " *Id.* at 186-87. Section 309 contains five uses of the term "statute of limitations," but no use of "statute of repose." Sun argues that "statute of limitations" has a plain meaning which excludes statutes of repose from its ambit. Therefore, according to Sun, it would be improper for a court to graft the words "and repose" onto the already clear language of § 309. "[T]he proper inquiry focuses on the ordinary meaning of the [provision] at the time Congress enacted it," and thus the appropri-

ate question is whether "statute of limitations" was ambiguous when § 309 was passed. *BedRoc Ltd.*, 541 U.S. at 184 (citing *Amoco Prod. Co. v. S. Ute Tribe*, 526 U.S. 865, 874 (1999)); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). In addition, it is the plain meaning or ambiguity of CERCLA, not the state statute involved, that this inquiry is concerned with.[2]

[3] The term "statute of limitations" was ambiguous regarding whether it included statutes of repose when § 309 was enacted in 1986. At that time, although some cases recognized the differences between statutes of limitation and repose, a number of cases confused the terms or used them interchangeably.[3] In the legal context, ambiguity is defined as "[a]n

[2]A The question of plain meaning or ambiguity refers to the meaning Congress considered when it passed § 309, and therefore Oregon's opinion of the meaning of the term carries no more weight than does that of any other State. The McDonalds make much of the fact that the Supreme Court of Oregon referred to the statute of repose at issue in this case, Or. Rev. Stat. § 12.115, as a "statute of limitations." *See Joseph v. Burns*, 491 P.2d 203, 207 (Or. 1971). This is relevant to the question of ambiguity merely as an example of a court using the two terms interchangeably, but the fact that it is an Oregon case addressing the statute of repose at issue here does not entitle it to any additional weight. The object of our inquiry is what the intent of Congress was when § 309 was adopted in 1986, not what Oregon courts may have said about Or. Rev. Stat. § 12.115(1) in 1971.

[3]Compare *City of Aurora v. Am. LaFrance Corp.*, No. 81-C-6638, 1984 U.S. Dist. LEXIS 20667, *2 (Dist. Ill. Jan 6, 1984); *Chamberlain v. Shmutz Mfg. Co.*, 532 F. Supp. 588, 590 (D. Kan. 1982); *Bauld v. J.A. Jones Constr. Co.*, 357 So. 2d 401, 402 (Fl. 1978); *Tindol v. Boston Hous. Auth.*, 487 N.E.2d 488, 489-90 (Mass. 1986); *James Ferrera & Sons Inc. v. Samuels*, 586 N.E.2d 58, 60-61 (Mass. App. Ct. 1985); *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 672 (Utah 1985); *City of Dover v. Int'l Tel. & Tel. Corp.*, 514 A.2d 1086, 1089 (De. 1986), *with United States v. Kubrick*, 444 U.S. 111, 117 (1979); *Bridges v. United* States, 346 U.S. 209, 230-31 (1953); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947); *United States v. Oregon Lumber Co.*, 260 U.S. 290, 300 (1922); *Gates Rubber Co. v. USM Corp.*, 508 F.2d 603, 611 (7th Cir. 1975); *Bolick v. Am. Barmag Corp.*, 306 N.C. 364, 366 (1982).

uncertainty of meaning or intention." Black's Law Dictionary (8th ed. 2004). Here, considerable uncertainty about the distinction existed in 1986.[4] Because of this ambiguity it is evident that the term "statute of limitations" had no plain meaning with respect to whether it included statutes of repose when § 309 was adopted.[5] It will therefore be necessary for the Court to examine the statute's legislative history in order to determine Congress's intent at the time of its adoption.

## 2.  *Burlington Northern*

The district court based its decision that "the plain language of [§ 309] does not extend to statutes of repose . . ." on *Burlington N. & Santa Fe R.R. Co. v. Poole Chem. Co.* 419 F.3d 355, 363 (5th Cir. 2005). *Burlington Northern* involved two large above ground storage tanks in Slanton, Texas, that were sold by Skinner Tank Company ("Skinner") to Poole Chemical Company ("Poole"), an agricultural blender, on October 28, 1988. *Id.* at 358. On January 29, 2003, one of the tanks ruptured, releasing several hundred thousand gallons of chemicals onto Poole's property and an adjacent railroad right-of-way. *Id.* On April 19, 2004, Poole sued Skinner, alleging that

---

[4]This becomes clear upon review of the scholarship of the time. For example, one 1980 article suggests that there were at least five definitions of "statute of limitations" in use, while a 1990 article stresses that there is no standard definition and that "[o]lder case-law and treatises use the phrases . . . interchangeably." *See* Francis E. McGovern, *The Variety, Policy and Constitutionality of Product Liability Statutes of Repose*, 30 Am. U. L. Rev. 579, 582 (1980); Lisa K. Mehs, Comment, *Asbestos Litigation and Statutes of Repose: The Application of the Discovery Rule in the Eighth Circuit Allows Plaintiffs to Breathe Easier*, 24 Creighton L. Rev. 965, 966-68 (1990).

[5]Sun cites *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004), for the proposition that "the Supreme Court has directed that CERCLA be construed according to its text." (Br. of Appellee 13.) This misrepresents the much narrower holding of *Cooper*, that CERCLA § 113(f)(1) has a plain meaning in relation to the issues in that case and therefore it was unnecessary for the Court to look to CERCLA's purpose to aid interpretation.

the tank Skinner sold to it was defective. *Id.* "Section 16.012 of the Texas Civil Practice and Remedies Code establishes a 15-year statute of repose for products liability cases." *Id.* Because suit was filed more than fifteen years after the sale of the tanks, if Texas's statute of repose applied, Poole would not prevail. The district court granted Skinner's motion for summary judgment on several grounds, and the Fifth Circuit affirmed, stating in pertinent part that the plain language of CERCLA § 309 does not extend to statutes of repose. *Id.* at 364. Although the court noted that "courts considering the applicability of [§ 309] have not always clearly distinguished a statute of repose from a statute of limitations," *Id.* at 362-63, it failed to address the question of whether the term was ambiguous when it was adopted and instead held itself "bound by [the] plain language, absent express congressional intent to the contrary." *Id.* at 364. It then failed to find express congressional intent. *Id.*

We believe the district court's reliance on *Burlington Northern* is misplaced. After a review of the legislative history, the court in *Burlington Northern* stated that "Congress intended for [§ 309] to preempt a state statute of limitations that deprives a plaintiff who suffers a long-latency disease caused by the release of a hazardous substance of his cause of action, but not to preempt a state statute of repose like [Texas's]." *Id.* However, that court pointed out that the case before it "does not involve the delayed discovery for which [§ 309] was intended to address. The case does not implicate a long-latency disease or involve a situation where the time for filing a claim expired before the plaintiff learned that a hazardous substance caused his injury." *Id.* at 365. This case does. Unlike the chemical spill in *Burlington Northern*, which was discovered before the expiration of time under the statute of repose, in this case the McDonalds did not discover the mercury in the calcine until after the statute had run. Because the discovery in *Burlington Northern* occurred prior to the expiration of time under the statute of repose, § 309's policies against destroying a plaintiff's claims before they could be

asserted underlying § 309 were not in issue. However, they are in issue in this case. Moreover, the *Burlington Northern* court failed to analyze the meaning of "statute of limitations" at the time § 309 was adopted. Therefore, the district court was mistaken in relying on that case when it held that Or. Rev. Stat. § 12.115(1) was not preempted by § 309.

3.   Legislative History

[4] Having determined that the term "statute of limitations" was ambiguous at the time CERCLA § 309 was adopted with respect to whether the term includes statutes of repose, the Court's next task is to review the legislative history of the section in order to determine Congress's intent. Two significant items of legislative history referencing this issue appear in the record. The first is a committee print filed under Section 301(e) of CERCLA which

> recommends that all states that have not already done so, clearly adopt the rule that an action accrues when the plaintiff discovers or should have discovered the injury or disease and its cause. The Recommendation is intended also to cover the repeal of the statutes of repose which, in a number of states have the same effect as some statutes of limitation in barring plaintiff's claim before he knows that he has one.

Superfund Section 301(e) Study Group, 97th Cong., Injuries and Damages from Hazardous Wastes—Analysis and Improvement of Legal Remedies 256 (Comm. Print 1982) (the "301(e) Report"). The second is from the House Conference Report, H.R. Conf. Rep. No. 99-962, at 261 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3354 (the "Conference Report"), which immediately preceded enactment of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986), which adopted § 309. The Conference Report, referring to CERCLA § 309,

states that "this section addresses the problem identified in the 301(e) study." *Id.* The Conference Report also states that

> State statutes of limitation define the time in which an injured party may bring a lawsuit seeking compensation for his injuries against the party alleged to be responsible for those injuries . . . . In the case of a long-latency disease, such as cancer, a party may be barred from bringing his lawsuit if the statute of limitations begins to run at the time of the first injury —rather than from the time when the party "discovers" that his injury was caused by the hazardous substance or pollutant or contaminant concerned.

*Id.* Taken together, the reports show that Congress's primary concern in enacting § 309 was to adopt the discovery rule in situations where a plaintiff may lose a cause of action before becoming aware of it—precisely the type of circumstance involved in this case. This predicament can be caused by either statutes of limitation or statutes of repose, and is probably most likely to occur where statutes of repose operate. Thus, given the ambiguity of the term "statute of limitations" at the time of the adoption of § 309, taken alongside the only evidence of Congressional intent, it is evident that the term "statute of limitations" in § 309 was intended by Congress to include statutes of repose.

Sun argues that because the 301(e) Report differentiated between statutes of limitation and statutes of repose that Congress, by only using the former term, evidenced intent to exclude the latter. However, this approach ignores the Conference Report, which states that the statute "addresses the problem identified in the 301(e) study." 301(e) Report, at 256. The problem of plaintiffs losing their cause of action before they know they have it could not have been addressed unless statutes of repose were addressed.

Sun cites the 301(e) Report for the proposition that statutes of repose are excluded because "the question is when the stat-

ute begins to run—the time when the action accrues . . . ." Sun asserts that use of the word "accrues" in the report, a word which typically applies to discovery of injury in statutes of limitations cases, is evidence that Congress intended to exclude statutes of repose from the definition of statutes of limitation. However, the cases Sun cites do not support this proposition. For example, in *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 196-97 (2d Cir. 2002), the court stated that it is "indisputedly clear that Congress intended, in the cases to which [§ 309] applies, that the [Federally Required Commencement Date] preempt state law accrual rules . . . ." However, this says nothing about whether Congress intended that § 309 apply to statutes of repose. Statements that Congress clearly intended § 309 to preempt state law accrual rules are not evidence that those are the only rules it intended to preempt.

Next, Sun argues that Congress could not have been ignorant of statutes of repose because it has enacted several of them. Sun cites four sections of the United States Code that contain provisions which would qualify as statutes of repose under the definition discussed above. From this Sun concludes that Congress knew the distinction when it omitted statutes of repose from § 309. It is telling, however, that none of the four sections cited by Sun use the phrase "statute of repose." In fact, an electronic search of the text of the United States Code also fails to reveal a single instance of the phrase "statute of repose." The fact that Congress knew how to enact a statute of repose, but to date has chosen not to label any as such is not legislative intent that supports Sun. Rather, it is additional evidence that the term "statute of limitations" was ambiguous.

Sun also argues that § 309 is inapplicable by its own terms because it requires "personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility . . . ." 42 U.S.C. § 9658(a). There

are no known personal injuries here. Sun argues there are also no property damages caused by a release into the environment. Even if one ignores the difference in value between mercury-free calcine and the calcine the McDonalds received, there is still damage in the form of $70,000 in cleanup costs associated with the spreading of the calcine on Mr. McDonald's driveway and parking lot. Sun's argument that under the statute there was no property damage caused by a release into the environment lacks merit.

**[5]** Lastly, Sun argues that the negligence claim is invalid because the alleged violations are within the scope of contractual duties. It is true that in order to "bring a tort claim based on conduct that is also a breach of a contract, a plaintiff must allege . . . [that a breach of an] independent standard of care stems from a particular special relationship between the parties." *Strader v. Grange Mut. Ins. Co.*, 39 P.3d 903, 906 (Or. Ct. App. 2002). Sun characterizes the conduct that it claims gives rise to both the negligence and contract claims as a "failure to provide mercury-free calcine and associated omissions and misrepresentations." However, the negligence claim is not based on any alleged promise to provide mercury-free calcine, but rather on alleged failures to warn about the mercury in the calcine and to test the calcine. A jury could find that there was no oral agreement, but that Sun was negligent in failing to warn that, for example, the calcine was not tested. The negligence claim should not have been dismissed.

## B.  CONTRIBUTION

**[6]** The district court also granted summary judgment to Sun on the McDonalds' claim for contribution under Or. Rev. Stat. § 465. The statute provides that a class of persons "shall be strictly liable for those remedial action costs incurred by the state or any other person that are attributable to or associated with a facility and for damages for injury to or destruction of any natural resources caused by a release . . . ." Or. Rev. Stat. § 465.255(1). "Remedial action costs" are defined

as "reasonable costs which are attributable to or associated with a removal or remedial action at a facility, including but not limited to the costs of administration, investigation, legal or enforcement activities, contracts and health studies." *Id.* at § 465.200(24). For there to be reasonable costs, there must first be a removal or remedial action. A "remedial action" is an action "consistent with a permanent remedial action taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of a hazardous substance so that it does not migrate to cause substantial danger to present or future public health, safety, welfare or the environment." *Id.* at (23).

[7] The issue for the Court is whether remedial action must be initiated by the government, or whether a private party may bring the remedial action. The district court and Sun take the view that, for "remedial action" to exist, the State must undertake, require, or oversee the action. We agree. Section 465.315(1)(b) anticipates that the Director of the DEQ "shall select or approve remedial actions . . ." and § 465.400(2) directs DEQ to "adopt rules establishing the levels, factors, criteria or other provisions for the degree of cleanup including . . . the selection of remedial actions necessary to assure protection of the public." Pursuant to § 465.400(2), DEQ engaged in rulemaking resulting in Or. Admin. R. § 340-122-0071(3), which states that "[a]fter a site evaluation is completed, [DEQ] will determine whether a preliminary assessment, removal, remedial action, other action, or no further action is needed at the facility." This rule suggests that the determination whether remedial action will occur will be made by DEQ, after a preliminary assessment is made, and not by the parties. Therefore, in order to proceed with remedial action, it was necessary for the McDonalds to get approval from DEQ. As they did not, the district court's grant of summary judgment on this issue will be affirmed.

## C.  BREACH OF CONTRACT

The McDonalds asserted a breach of contract claim based upon an alleged oral warranty by Sun's Wally Freeman that the calcine was free of mercury. The district court granted summary judgment to Sun on this claim, citing the parol evidence rule and the merger doctrine. The McDonalds argue that it was error to grant summary judgment on either of these grounds. Because the Court concludes that the district court properly granted summary judgment to Sun based upon the parol evidence rule, we affirm the district court's grant of summary judgment to Sun on the breach of contract claim and find it unnecessary to reach the merger doctrine issue.

### 1.  Parol Evidence Rule

[8] Oregon's statutory parol evidence rule states that "[w]hen the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be . . . no evidence of the terms of the agreement, other than the contents of the writing . . . ." Or. Rev. Stat. § 41.740. "The term 'agreement' includes deeds . . . as well as contracts between parties." *Id.* However, the rule does not bar evidence extrinsic to the writing unless the writing is an integrated agreement. *Abercrombie v. Hayden Corp.*, 883 P.2d 845, 850 (Or. 1994) (citing *Land Reclamation v. Riverside Corp.*, 492 P.2d 263 (Or. 1972)). An agreement is integrated if "the parties intended [it] to be a final expression of some or all of the terms . . . ." *Abercrombie*, 883 P.2d at 850; *see also* Restatement (Second) of Contracts § 209 (1979); 2 Farnsworth, Farnsworth on Contracts § 7.3 (1990); Calamari & Perillo, Contracts § 3-3 (3d ed 1989). If a writing is completely integrated, it may not be contradicted or supplemented by prior terms. *Abercrombie*, 883 P.2d at 851. However, if it is partially integrated, evidence of prior consistent, additional terms is allowed so long as such terms do not contradict the writing. *Id.* Whether the parties intended a writing to be integrated or not and whether an integrated writing is

completely or partially integrated are both questions of fact for the court. *Abercrombie*, 883 P.2d at 851. The court may consider all the circumstances, including parol evidence, to determine whether the parties intended the writing to be a complete or partial integration. *Id.* "An integrated writing is partially integrated if the writing omits a consistent, additional agreed-upon term, which was (1) agreed to by the parties for separate consideration, or (2) such a term as in the circumstances might naturally be omitted from the writing." *Id.*

**[9]** In this case, it is undisputed that if the alleged warranty that the calcine was free of contamination had been made, the warranty would be consistent with the terms of the deed. It is similarly clear that there was no separate consideration for the alleged warranty. The key issue therefore is whether the alleged warranty "might naturally be omitted from the writing." Restatement (Second) of Contracts § 216 cmt. d. (1979).

**[10]** The district court found that Mr. McDonald, as the owner of a number of businesses, a party to numerous real estate transactions, and user of the property for a business purpose, was a sophisticated businessman and that "parties with business experience are more likely to reduce their entire agreement to writing than parties without such experience . . . ." *Hatley v. Stafford*, 588 P.2d 603, 609 (Or. 1978). The court also found that the deed was prepared by Mr. McDonald's attorney and that it expressly addressed the issue of calcine and did not offer any warranties concerning its commercial viability. Taken together, these circumstances show that if there had been a prior oral agreement warranting the calcine, it would have been unnatural for Mr. McDonald's attorney to omit that term from the deed. For these reasons, we affirm the district court's grant of summary judgment to Sun on the parol evidence rule issue and the contract claim.

## D.   FRAUD

**[11]** Last, the McDonalds argue that the district court erred when it sustained Sun's motion for summary judgment and

dismissed their fraud claim. In order to succeed on their fraud claim, it is the McDonalds' burden to show by clear and convincing evidence:

(1) a representation;

(2) its falsity;

(3) its materiality;

(4) the defendant's knowledge of its falsity or ignorance of its truth;

(5) the defendant's intent that the representation should be acted on by the plaintiff and in the manner reasonably contemplated;

(6) the plaintiff's ignorance of its falsity;

(7) the plaintiff's reliance on its truth;

(8) the plaintiff's right to rely on the representation;

(9) and the plaintiff's resulting injury.

*Smallwood v. Fisk*, 934 P.2d 557, 559 (Or. App. 1997) (citing *Rice v. McAlister*, 519 P.2d 1263 (Or. 1974)). The key issue here is whether Sun's employee Freeman knew that his alleged statement that there was no mercury in the calcine was false when he made it or that he was ignorant regarding its truth or falsity. The McDonalds concede that no evidence in the record directly proves what Freeman knew about the cleanliness of the calcine at the time of the negotiations. The McDonalds argue that a jury could find that in 1973 Freeman was reckless to rely on antiquated 1958 field testing designed only to evaluate whether there was commercially recoverable mercury in the calcine when he allegedly made the statement to McDonald, or that he was reckless because of the high

probability that he knew nothing about Sunoco's 1958 field assay. We disagree. The McDonalds offered no evidence to support these theories. The only evidence in the record bearing on Freeman's mental state at the relevant time is that tests conducted during the 1930s, 1940s, and 1950s would have shown that all of the mercury had been removed from the calcine, that by 1973 common assay methods would still not have detected mercury in the calcine, and that calcine was used in road construction at least into the 1980s.

**[12]** The McDonalds suggest that because there is no evidence that Freeman ever went to the mine before meeting with McDonald, because there is no evidence that Cordero Mining ever reported the results of its field assays to corporate, because "[e]vidence about what Freeman knew or did not know about the calcine is conspicuously absent from the voluminous documents produced by Sunoco," and because they are entitled to all reasonable inferences at summary judgment, that they have shown that the "record fails to establish that Freeman had *any* basis for representing the calcine to be mercury-free." (Appellants' Reply Br. 26 (emphasis in original).) However, this statement ignores the burden of proof. The McDonalds had the burden of presenting evidence sufficient that a reasonable jury could find by clear and convincing evidence that Freeman made the statements with ignorance as to their truth. It was not Sun's burden to show that Freeman had a basis for making the statements; it was the McDonalds' burden to show that he did not. The McDonalds provide no evidence about Freeman's knowledge of falsity, and therefore they cannot meet their burden. The district court's grant of summary judgment on the fraud issue will be affirmed.

## IV. CONCLUSION

The district court erred in granting summary judgment to Sun on the McDonalds' negligence claim and that claim is remanded for trial. The district court correctly concluded that summary judgment was proper on the McDonalds' contribu-

tion, breach of contract and fraud claim. Each party shall pay their own costs.

**AFFIRMED in part, REVERSED in part, and REMANDED.**