Certiorari granted by Supreme Court, January 10, 2014
Reversed by Supreme Court, June 9, 2014

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1290

PETER WALDBURGER; SANDRA RATCLIFFE; LEE ANN SMITH; TOM
PINNER, IV, a/k/a Bud Pinner, IV; HANS MOMKES; WILMA
MOMKES; WALTER DOCKINS, JR.; AUTUMN DOCKINS; WILLIAM CLARK
LISENBEE; DAN MURPHY; LORI MURPHY; ROBERT AVERSANO; DANIEL
L. MURPHY; LAURA A. CARSON; GLEN HORECKY; GINA HORECKY;
RENEE RICHARDSON; DAVID BRADLEY; BYRON HOVEY; RAMONA HOVEY;
PETER TATUM MACQUEEN, IV; BETHAN MACQUEEN; PATRICIA PINNER;
TOM PINNER, III, a/k/a Buddy Pinner, III; MADELINE PINNER,

Plaintiffs - Appellants,

v.

CTS CORPORATION,

Defendant - Appellee.

------------------------------------

UNITED STATES OF AMERICA,

Amicus Supporting Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Asheville. Graham C. Mullen,
Senior District Judge. (1:11-cv-00039-GCM-DLH)

Argued: January 30, 2013                 Decided: July 10, 2013

Before DAVIS, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Judge Floyd wrote
the majority opinion, in which Judge Davis joined. Judge Davis

wrote a separate concurring opinion. Judge Thacker wrote a dissenting opinion.

————————————

**ARGUED:** Emma A. Maddux, Third-Year Law Student, WAKE FOREST UNIVERSITY, Winston-Salem, North Carolina, for Appellants. Earl Thomison Holman, ADAMS, HENDON, CARSON, CROW & SAENGER, PA, Asheville, North Carolina, for Appellee. Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Supporting Appellee. **ON BRIEF:** John J. Korzen, Director, Hillary M. Kies, Third-Year Law Student, WAKE FOREST UNIVERSITY, Winston-Salem, North Carolina, for Appellants. Stuart F. Delery, Acting Assistant Attorney General, Thomas M. Bondy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Anne Tompkins, United States Attorney, Charlotte, North Carolina, for Amicus Supporting Appellee.

————————————

FLOYD, Circuit Judge:

In 2009, Appellants David Bradley and Renee Richardson received unwelcome news: Their well water contained concentrated levels of trichloroethylene (TCE) and cis-1,2-dichloroethane (DCE), both solvents that have carcinogenic effects. Not surprisingly, Bradley and Richardson, and twenty-three other landowners (collectively, "the landowners"), brought a nuisance action against Appellee CTS Corporation (CTS), the alleged perpetrator. Concluding that North Carolina's ten-year limitation on the accrual of real property claims barred the suit, the district court granted CTS's Rule 12(b)(6) motion to dismiss. Having reviewed the dismissal de novo, assuming that the facts stated in the complaint are true, <u>Lambeth v. Bd. of Comm'rs</u>, 407 F.3d 266, 268 (4th Cir. 2005), we hold that the discovery rule articulated in § 9658 of the Comprehensive Environmental Response, Liability, and Compensation Act (CERCLA), 42 U.S.C. §§ 9601-9675, preempts North Carolina's ten-year limitation. Thus, we reverse and remand.


I.

In the 1960s and '70s, the United States witnessed the repercussions of toxic waste dumping like it never had before.

3

The Valley of the Drums[1] and Love Canal[2] disasters made headlines, urging Congress to pass legislation that granted some measure of redress.   In response, in 1980, Congress passed CERCLA, an act aimed at promoting efficient and equitable responses to the fallout from hazardous waste.  <u>Burlington N. & Santa Fe Ry. Co. v. United States</u>, 556 U.S. 599, 602 (2009). Because Congress passed the legislation during the closing hours of its ninety-sixth session, and only after it reached a compromise reflecting the "blending of three separate bills," CERCLA is often criticized for its lack of precision.  <u>See, e.g.</u>, <u>State of New York v. Shore Realty Corp.</u>, 759 F.2d 1032, 1039–40 (2d Cir. 1985) ("In 1980, while the Senate considered one early version of CERCLA, the House considered and passed another.  The version passed by both Houses, however, was an eleventh hour compromise put together primarily by Senate

---

[1] The Valley of the Drums is a twenty-three acre site near Louisville, Kentucky, where a large number of waste-storing drums were deposited in the 1960s.  The drums' leakage and the lack of regulation at the site caused an environmental disaster. <u>NPL Site Narrative for A.L. Taylor (Valley of the Drums)</u>, Envtl. Prot. Agency (Sept. 8, 1983), http://www.epa.gov/superfund/sites/npl/nar447.htm.

[2] Love Canal is an area near Niagara Falls, New York.  In the 1920s, it became a dumpsite for toxic chemicals.  The extent of the site's contamination was brought to light in the mid-1970s.  Eckardt C. Beck, <u>The Love Canal Tragedy</u>, Envtl. Prot. Agency (Jan. 1979), http://www.epa.gov/history/topics/lovecanal/01.html.

4

leaders and sponsors of the earlier Senate versions." (citations omitted)); Artesian Water Co. v. New Castle Cnty., 851 F.2d 643, 648 (3d Cir. 1988) ("CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage."); see also Rhodes v. Cnty. of Darlington, 833 F. Supp. 1163, 1172-76 (D.S.C. 1992) (providing a thorough recounting of CERCLA's history). Regardless, it remains undisputed that CERCLA is a remedial statute designed to (1) "establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites" and (2) "shift the costs of cleanup to the parties responsible for the contamination." Metro. Water Reclamation Dist. v. N. Am. Galvanizing & Coatings, Inc., 473 F.3d 824, 826-27 (7th Cir. 2007) (quoting H.R. Rep. No. 96-1016, pt. 1, at 22 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6120) (internal quotation marks omitted); see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 120 (2d Cir. 2010) ("Enacted in response to New York's Love Canal disaster, CERCLA was designed, in part, to '[ensure] that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.'" (footnote omitted) (quoting S. Rep. No. 96-848, at 13 (1980)).

5

Evidently wary about the effectiveness of the Act's final version, Congress immediately established a study group to examine the "adequacy of existing common law and statutory remedies in providing legal redress for harm . . . caused by the release of hazardous substances into the environment." 42 U.S.C. § 9651(e)(1). The Group consisted of twelve members designated by the American Bar Association, the American Trial Lawyers Association, the Association of State Attorneys General, and the American Law Institute. Id. § 9651(e)(2). Among other "[r]ecurring [i]ssues in [h]azardous [w]aste [l]itigation," it considered the effect that state limitations periods have on causes of action related to hazardous waste, noting that (1) injuries from such waste generally have "long latency periods, sometimes 20 years or longer" and (2) if a state decrees that a cause of action will accrue upon a defendant's last act or a plaintiff's exposure to harm, the statute of limitations often will fully run and defeat a lawsuit before a plaintiff is aware of his injury. Superfund Section 301(e) Study Group, 97th Cong., Injuries and Damages from Hazardous Wastes-Analysis and Improvement of Legal Remedies pt. 1, at 28 (Comm. Print 1982). Purposing to "remove unreasonable procedural and other barriers to recovery in court . . . , including rules relating to the time of accrual of actions," id. at 240, the Group issued the following recommendation: "that all states . . . clearly adopt

6

the rule that an action accrues when the plaintiff discovers or should have discovered the injury or disease and its cause," id. at 241.  Worth noting is that the Group did not confine its concerns simply to statutes of limitation:  "The Recommendation is intended also to cover the repeal of statutes of repose which, in a number of states have the same effect as some statutes of limitation in barring [a] plaintiff's claim before he knows that he has one."  Id.

Instead of waiting for individual states to amend their respective statutes, in 1986 Congress chose to "address[] the problem identified in the . . . study," H.R. Conf. Rep. No. 99-962, at 261, reprinted in 1986 U.S.C.C.A.N. 3276, 3354, by enacting § 9658 of CERCLA:

> (a) State statutes of limitations for hazardous substance cases
>
> (1) Exception to State statutes
>
> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.
>
> (2) State law generally applicable

> Except as provided in paragraph (1), the statute of limitations established under State law shall apply in all actions brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility.

42 U.S.C. § 9658. Per the section's definition section, "'applicable limitations period' means the period specified in a statute of limitations during which a civil action referred to in subsection (a)(1) . . . may be brought," id. § 9658(b)(2), "'commencement date' means the date specified in a statute of limitations as the beginning of the applicable limitations period," id. § 9658(b)(3), and "'federally required commencement date' means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." Id. § 9658(b)(4)(A). Thus, if a state statute of limitations provides that the period in which an action may be brought begins to run prior to a plaintiff's knowledge of his injury, § 9658 preempts the state law and allows the period to run from the time of the plaintiff's actual or constructive knowledge. And if a minor or incompetent plaintiff is involved, the period does not begin to run until the plaintiff reaches majority or competency or "has a legal representative appointed." Id. § 9658(b)(4)(B).

8

II.

During the twenty-seven years since Congress passed § 9658, the amendment has no doubt served the goal of preserving claims that otherwise would have been defeated by state statutes of limitations. But it has also generated controversy. We address one such area of dispute here—namely, whether § 9658 preempts state statutes of repose.

A.

The site at issue in this case is in Asheville, North Carolina, where CTS formerly operated a fifty-four-acre plant.[3] CTS "manufactures" and "disposes of" electronics and electronic parts, and from 1959 to 1985, it operated the Mills Gap Road Electroplating Facility (the Facility) in Asheville. At the Facility, CTS stored notable quantities of TCE and manufactured products using TCE, cyanide, chromium VI, and lead.

In 1987, CTS sold the Facility to Mills Gap Road Associates. CTS had promised realtors that the property "ha[d] been rendered in an environmentally clean condition," that "[t]o the best of [its] knowledge, no on-site disposal or otherwise

---

[3] CTS was formed in 1959 as CTS of Asheville, Inc. In 1983, CTS of Asheville, Inc., dissolved, but CTS continued to operate the Asheville plant as CTS Corporation, Asheville Division until 1985.

9

wanton disposal methods were practiced at [the] facility," and that as soon as "the existing inventory of materials contained in drums and other miscellaneous equipment within the plant [was] removed from the premises, no threat to human health or the environment [would] remain."

Mills Gap Road Associates eventually sold portions of the land to Bradley, Richardson, and others, and as noted above, Bradley and Richardson learned subsequent to their purchases that their land was contaminated. Thus, they joined with others who "live in the vicinity of [their] residence" to bring a nuisance claim. The other property owners claim that they "have been and continue to be exposed to the CTS . . . toxins via contact from air, land and water."

The landowners cite damages such as "diminution in the value of their real property" and fear "for their health and safety and that of their family members." They request (1) a "judgment against [CTS] requiring reclamation of the 1,000,000 pounds of the toxic chemical contaminants" that belong to the corporation, (2) "remediation of the environmental harm caused by [CTS's] toxic chemicals," and (3) "monetary damages in an amount that will fully compensate them for all the losses and damages they have suffered, or . . . will suffer in the future."

10

B.

In North Carolina, real property actions are subject to a three-year statute of limitations per the "Limitations, Other than Real Property" section of the General Statutes. See N.C. Gen. Stat. § 1-52; Crawford v. Boyette, 464 S.E.2d 301, 303 (N.C. App. 1995). A real property action accrues when "physical damage to [a claimant's] property becomes apparent or ought reasonably to have become apparent." N.C. Gen. Stat. § 1-52(16). Notably, however, a claimant's actual or constructive knowledge of damage is not the only factor that regulates accrual. Nor does lack of such knowledge lend life to a claim indefinitely. Rather, § 1-52(16) prohibits a "cause of action [from] . . . accru[ing] more than 10 years from the last act or omission of the defendant giving rise to the cause of action." Id. Accordingly, once ten years have passed since a defendant's last tortious act, claims for damages from such conduct become nonexistent, regardless of whether a claimant had knowledge of his harm within the ten-year window.

Here, the last act or omission of CTS occurred in 1987, when it sold the Facility to Mills Gap Road Associates. Thus, when the landowners filed their nuisance action in 2011, CTS moved to dismiss, maintaining that North Carolina's ten-year limitation on the accrual of real property actions barred the claim. The landowners countered, citing § 9658 of CERCLA as

11

preemptive of North Carolina's limitation. The magistrate judge rejected the landowners' argument. The court reasoned that the ten-year limitation is a statute of repose and that because § 9658 mentions only statutes of limitations, it is inapplicable here. Thus, it recommended dismissal, and the district court adopted the recommendation.

III.

Before analyzing the decision below, we briefly review the concepts of limitations and repose. Statutes of limitations and statutes of repose both operate as limits on the amount of time that a plaintiff has to bring a claim. A statute of limitations is a "law that bars claims after a specified period . . . based on the date when the claim accrued (as when the injury occurred or was discovered)." Black's Law Dictionary 1546 (9th ed. 2009). As this Court has previously noted, such limitations serve defendants by "encourag[ing] prompt resolution of disputes by providing a simple procedural mechanism to dispose of stale claims." First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 866 (4th Cir. 1989). In contrast, a statute of repose "bar[s] any suit that is brought after a specified time since the defendant acted . . . even if this period ends before the plaintiff has suffered a resulting injury." Black's Law Dictionary 1546 (9th ed. 2009). Where

12

repose is concerned, "considerations of the economic best interests of the public as a whole" are at play, and "substantive grants of immunity based on a legislative balance of the respective rights of potential plaintiffs and defendants [are] struck by determining a time limit beyond which liability no longer exists." First United Methodist, 882 F.2d at 866.

Here, North Carolina's ten-year limitation bars lawsuits "brought after a specified time since the defendant acted," Black's Law Dictionary 1546 (9th ed. 2009), without regard for the plaintiff's knowledge of his harm, N.C. Gen. Stat. § 1-52(16). As such, although North Carolina does not explicitly identify the limitation as a statute of repose (or, for that matter, use the word "repose" anywhere in its statutes), we think the court below properly categorized it as such. Cf. Robinson v. Wadford, 731 S.E.2d 539, 541 (N.C. Ct. App. 2012) (referring to the ten-year limitation in § 1-52(16) as a statute of repose); Tipton & Young Constr. Co. v. Blue Ridge Structure Co., 446 S.E.2d 603, 604 (N.C. Ct. App. 1994) (same).

A.

Determining whether § 9658 affects the operation of North Carolina's ten-year limitation is an exercise in statutory interpretation. When we interpret statutes, our goal is to effectuate Congress's intent, United States v. Abdelshafi, 592

13

F.3d 602, 607 (4th Cir. 2010), and we accomplish this by first examining the text of the statute, Holland v. Big River Minerals Corp., 181 F.3d 597, 603 (4th Cir. 1999).  If we find the meaning of the text plain, we accord it that meaning "[a]bsent . . . clearly expressed legislative intent to the contrary."  Abdelshafi, 592 F.3d at 607 (quoting United States v. Bell, 5 F.3d 64, 68 (4th Cir. 1993)) (internal quotation marks omitted).  If we determine that its meaning is ambiguous, however, we "look beyond the language of the statute to the legislative history for guidance."  Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1482 (4th Cir. 1996) (en banc).  Moreover, we determine whether a statute's language is plain "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Holland, 181 F.3d at 603 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)) (internal quotation marks omitted).

B.

Here, we interpret a statute that is ambiguous.  As noted by the district court, § 9658 uses the words "statute of limitations."  Indeed, the phrase and its plural form appear five times.  See § 9658(a), (b)(2), (b)(3).  Noticeably absent is the phrase "statutes of repose."  Thus, a simple review of

14

§ 9658's language could reasonably lead to a conclusion that its application is limited only to statutes of limitations. We agree with the court below that the text is susceptible to this interpretation. But we also think that the text lends itself to an alternate reading—one that includes repose limitations such as North Carolina's.

Per the text of § 9658, a state limitations period must meet two conditions before the federally required commencement date applies to a cause of action: (1) it must be an "applicable limitations period" that is "specified in the State statute of limitations or under common law" and (2) it must "provide[] a commencement date which is earlier than the federally required commencement date." Id. § 9658(a)(1). For the following reasons, we think North Carolina's ten-year limitation meets these conditions here.

First, the ten-year bar is located with the statutes of limitations periods in a section titled, "Limitations, Other than Real Property." N.C. Gen. Stat. § 1-52. As such, it is a limitations period "specified in the State statute of limitations or under common law." See 42 U.S.C. § 9658(a)(1). Second, it is (1) a "period," (2) "specified in a statute of limitations," (3) "during which a civil action . . . may be brought"; thus, it comports with the definition of "applicable limitations period." See id. § 9658(b)(2). Finally, because

15

the period begins to run when the defendant commits his last act, rather than when the plaintiff has knowledge of harm, its "commencement date . . . is earlier than the federally required commencement date." See id. § 9658(a)(1). Accordingly, we conclude that in spite of § 9658's repeated use of the phrase "statute of limitations," the text is susceptible to an interpretation that includes repose limitations such as North Carolina's. In sum, we reckon § 9658's text capable of at least two interpretations, preventing it from being straightforwardly categorized as "plain and unambiguous."

Lest we seem to be stretching to find ambiguity in the text, we make two additional observations. First, the terms "statute of limitations" and "statute of repose" have seen considerable development in their usage and meaning. Indeed, a historical analysis reveals that both scholars and courts have often used the terms interchangeably. See McDonald v. Sun, 548 F.3d 774, 781 & n.3, n.4 (9th Cir. 2008) (collecting cases and academic articles that demonstrate a historical lack of distinction between the terms). Thus, in this context, Congress's choice to use "statute of limitations" is in no way dispositive as to whether it intended § 9658 to apply to statutes of repose. Rather, given the inconsistent manner in which the term has been used, it is entirely probable that in 1986, when Congress added § 9658 to CERCLA, it intended "statute

16

of limitations" to include precisely the type of ten-year limitation that we are dealing with here. Second, § 9658 manifests a lack of internal consistency in its reference to an "applicable limitations period." Subsection (a)(1) notes that such a period is "specified in the State statute of limitations or under common law," but the definition of "applicable limitations period" and "commencement date" make no reference to common law. Thus, to the extent that a limitations period is established only under common law, § 9658 fails to manifest a plain meaning applicable in such a circumstance.

C.

When the text of a statute is ambiguous, we "look to other indicia of congressional intent such as the legislative history" to interpret the statute. CGM, LLC, v. BellSouth Telecomm's, Inc., 664 F.3d 46, 53 (4th Cir. 2011). As explained in Part I, supra, § 9658 was adopted by Congress to "address[] the problem identified in the . . . study [group report]," H.R. Conf. Rep. No. 99-962, at 261, reprinted in 1986 U.S.C.C.A.N. 3276, 3354. The study group report was equally concerned with statutes of repose and limitations, and with their effect of barring plaintiffs' claims before they are aware of them.

Moreover, Congress's purpose in enacting CERCLA was remedial. Blake A. Watson, Liberal Construction of CERCLA Under

17

the Remedial Purpose Canon: Have the Lower Courts Taken a Good Thing Too Far?, 20 Harv. Envtl. L. Rev. 199, 286 (1996) ("CERLCA is not only more remedial than most legislative enactments, it is arguably the most remedial of all federal environmental statutes . . . ."). Indeed,

> [t]he Act is distinctive in the spectrum of federal environmental protection legislation in that the principal focus is remedial and corrective rather than regulatory. CERCLA does not set standards for prospective compliance by industry but essentially is a tort-like backward-looking statute designed to [clean up] expeditiously abandoned hazardous waste sites and respond to hazardous spills and releases of toxic wastes into the environment.

Id. (quoting William Murray Tabb & Linda A. Malone, Environmental Law: Cases & Materials 637 (1992)). Moreover, § 9658 resulted from Congress's additional attempts to ensure adequate remedies, and it furthers CERCLA's remedial goals by preempting state limitation periods that would otherwise bar causes of action when harms lie dormant. We have observed that "CERCLA, as all remedial statutes, must be given a broad interpretation to effect its ameliorative goals." First United Methodist, 882 F.2d at 867.

When faced with a remedial statute, our interpretive charge is simple: Employ a "standard of liberal construction [to] accomplish [Congress's] objects." Urie v. Thompson, 337 U.S. 163, 180 (1949); see also Niagara Mohawk Power Corp., 596 F.3d at 132 (recognizing the need to liberally construe CERCLA to

18

accomplish congressional objectives); see also Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc., 191 F.3d 409, 416 (4th Cir. 1999) (same).  In light of this charge, we reject a reading of § 9658 that excludes application of its provisions to North Carolina's ten-year limitation.  Such an interpretation may seem to be textually sound under one possible reading of the statute, but it offers too narrow an approach and one that thwarts Congress's unmistakable goal of removing barriers to relief from toxic wreckage.  Refusing to apply § 9658 to statutes of repose allows states to obliterate legitimate causes of action before they exist.  Because this is precisely the barrier that Congress intended § 9658 to address, we will not read the statute in a manner that makes it inapplicable in such a circumstance.  Doing so cannot be termed an honest attempt to "effectuate Congress's intent."   Accordingly, we hold that the federally required commencement date in § 9658 preempts North Carolina's ten-year limitation on the accrual of real property claims.

In so holding, we join the view articulated by the Ninth Circuit in McDonald v. Sun, in which the plaintiffs found themselves in circumstances remarkably similar to those of the landowners in this case.  See 548 F.3d at 777-78, 783 ("[G]iven the ambiguity of the term 'statute of limitations at the time of the adoption of § [9658], taken alongside the only evidence of Congressional intent, it is evident that the term 'statute of

19

limitations' in § [9658] was intended by Congress to include statutes of repose."). Although the Fifth Circuit delineated an opposing view in <u>Burlington Northern & Sante Fe Railway Co. v. Poole Chemical Co.</u>, 419 F.3d 355 (5th Cir. 2005), we are unpersuaded by its reasoning. There, the plaintiffs had knowledge of their claim prior to expiration of the state statute of repose. <u>Id.</u> at 359-60, 364-65. Thus, as recognized by that court, the "case [did] not involve the delayed discovery . . . which § 9658 was intended to address." <u>Id.</u> at 364-65.

D.

Our decision here will likely raise the ire of corporations and other entities that wish to rest in the security of statutes of repose, free from the threat of being called to account for their contaminating acts. They likely will cite the well-known policies underlying such statutes and asseverate that we have ignored them. But we are not ignorant of these policies, nor have we turned a blind eye to their importance.

Repose statutes do not exist simply to protect defendants; they also ensure that cases are processed efficiently. <u>See</u> <u>United States v. Kubrick</u>, 444 U.S. 111, 117 (1979) ("[S]tatutes of repose . . . protect defendants and the courts from having to deal with cases in which the search for truth may be seriously

20

impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise."). And although our decision removes one potential time barrier to a plaintiff's claim, it does not relax his burden of proof. In cases with latent harms, necessary evidence will disappear as time passes, and intervening causes will complicate efforts to pin costs on one party. Even without the hindrance of an official repose statute, plaintiffs may not be able to establish a cause of action or recover damages. Furthermore, because our decision does nothing to diminish North Carolina's requirement that plaintiffs bring claims within three years of discovery, defendants will not necessarily be endlessly subjected to the possibility of litigation. Finally, our stance goes no further than that contemplated by the study group that Congress commissioned. The Group foresaw that the "legislative balance of the respective rights of potential plaintiffs and defendants," First United Methodist, 882 F.2d at 866, reflected in statutes of repose might in this circumstance need to tip in favor of plaintiffs: "The policy of repose expressed in the statute of limitations may be outweighed by the policy of affording the plaintiff a just opportunity to vindicate his rights." Superfund Section 301(e) Study Group, 97th Cong., Injuries and Damages from Hazardous Wastes-Analysis and

21

Improvement of Legal Remedies pt. 2, at 14 (Comm. Print 1982). Accordingly, we reaffirm our conclusion that North Carolina's ten-year limitation on the accrual of actions is preempted by § 9658 of CERCLA. In so holding, we simply further Congress's intent that victims of toxic waste not be hindered in their attempts to hold accountable those who have strewn such waste on their land.

IV.

For the foregoing reasons, we reverse the district court's order and remand the case so that the litigation can proceed.

REVERSED AND REMANDED

DAVIS, Circuit Judge, concurring:

"Of course, determining whether a regulation or statute is ambiguous presents a legal question, which we determine de novo." Humanoids Group v. Rogan, 375 F.3d 301, 306 (4th Cir. 2004). To say, as our good colleague says in dissent, that the majority's legal conclusion that § 9658 is ambiguous must be "supported by the plain language of the statute itself," post, at 26, finds no support in Supreme Court or Fourth Circuit authority. "Plain language" analysis does no such work. See Watt v. Alaska, 451 U.S. 259, 266 (1981) ("[T]he plain-meaning rule is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.") (citation and internal quotation marks omitted). Moreover, in any event, as the majority opinion makes clear, "the meaning of statutory language, plain or not, depends on context." Holloway v. United States, 526 U.S. 1, 7 (1999) (quotations omitted). Judge Floyd's careful analysis is faithful to this important, overarching principle, and I am pleased to join his fine opinion in full.

23

THACKER, Circuit Judge, dissenting:

With all due respect to my friends in the majority, I must dissent. The majority essentially concludes § 9658 preempts two categories of state statutes: statutes of limitations and statutes of repose. However, in my view the plain and unambiguous language of § 9658 indicates only statutes of limitations were intended to be preempted. Even if the preemptive effect of § 9658 were susceptible to two interpretations, a presumption against preemption would counsel that we should limit § 9658's preemptive reach to statutes of limitations without also extending it to statutes of repose.

The relevant legislative history underscores this plain reading of the statute, and a plain reading of § 9658 aligns with general, deferential principles of legislative compromise that counsel against a liberal reading of the statute. Accordingly, I would affirm.

I.

Although this case arises in the context of federal preemption, at its core, it is about statutory interpretation. The key issue is whether the phrase "statute of limitations" as used in the 1986 amendments to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Act of Oct. 27, 1986, Pub. L. No. 99-499, 100 Stat. 1613 ("1986

24

Amendments"), and codified in 42 U.S.C. § 9658, preempts North Carolina's 10-year statute of repose.

## A.

## Plain Meaning

As in all matters of statutory interpretation, our starting point is an analysis of the statutory text. Chris v. Tenet, 221 F.3d 648, 651 (4th Cir. 2000). We must begin by asking "whether the language at issue has a plain and unambiguous meaning . . . ." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). This first step may also be our last: if the statutory language has a plain and unambiguous meaning, "we must apply the statute according to its terms." Carcieri v. Salazar, 555 U.S. 379, 387 (2009).

In determining whether the language has a plain and unambiguous meaning, "we consider the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Johnson v. Zimmer, 686 F.3d 224, 232 (4th Cir. 2012) (internal quotation marks omitted). If certain terms are undefined in the relevant statutory provisions, they "are typically interpreted as taking their ordinary, contemporary, common meaning." Id. (internal quotation marks omitted).

25

1.

Language of Section 9658

CERCLA § 9658 governs actions under state law for damages from exposure to hazardous substances, and provides that generally, "the statute of limitations established under State law shall apply . . . ." 42 U.S.C. § 9658(a)(2). But the statute also provides the following exception to this general rule:

> [I]f the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

Id. § 9658(a)(1). Of critical import here, the statute defines the "applicable limitations period" as "the period specified in a statute of limitations during which a civil action referred to in subsection (a)(1) of this section may be brought." Id. § 9658(b)(2) (emphasis supplied). Similarly, the statute defines the state "commencement date" as "the date specified in a statute of limitations as the beginning of the applicable limitations period." Id. § 9658(b)(3) (emphasis supplied). The "federally required commencement date" provides an enhanced version of the traditional discovery rule and is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or

26

contributed by the hazardous substance . . . ." <u>Id.</u> § 9658(b)(4).[1] Thus, § 9658 will preempt state law where a state statute of limitations begins to run before it would have run under the federally required commencement date.

The key question then is whether the meaning of § 9658, by its reference to "statute of limitations," is plain and unambiguous. The majority answers that question by concluding that the phrase "statute of limitations" is ambiguous, and thus encompasses both statutes of limitations and statutes of repose. <u>Ante</u> at 16 (determining that "§ 9658's text [is] capable of at least two interpretations, preventing it from being straightforwardly categorized as 'plain and unambiguous.'"). The majority's conclusion, however, is not supported by the plain language of the statute itself.

2.

Modern and Historical Context

The difficulty presented in this case springs from the definitions of "statutes of limitations" and "statutes of repose" in use today versus their historical understanding.

---

[1] As opposed to a more traditional discovery rule that requires simply knowledge of the injury, the "federally required commencement date" requires both knowledge of the injury <u>and</u> its cause. Therefore, this dissent at times uses the term "enhanced discovery rule" to refer to the rule as expressed in the definition of "federally required commencement date."

Today, we understand a statute of limitations, on the one hand, to be "a procedural device that operates as a defense to limit the remedy available from an existing cause of action." First United Methodist Church of Hyattsville v. U.S. Gypsum Co., 882 F.2d 862, 865 (4th Cir. 1989); see also Black's Law Dictionary 1546 (9th ed. 2009) (defining statute of limitations as "A law that bars claims after a specified period; specif., a statute establishing a time limit for suing in a civil case, based on the date when the claim accrued (as when the injury occurred or was discovered)."). In other words, a statute of limitations "extinguishes the right to prosecute an accrued cause of action after a period of time." Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co., 419 F.3d 355, 363 (5th Cir. 2005) (internal quotation marks omitted). Statutes of limitations typically begin to run either on the date of the plaintiff's injury, or on the date the injury is first discovered or should have been discovered with reasonable diligence. See id.

A statute of repose, on the other hand, "creates a substantive right in those protected to be free from liability after a legislatively-determined period of time." First United Methodist, 882 F.2d at 866; see also Black's Law Dictionary 1546 (9th ed. 2009) (defining statute of repose as "[a] statute barring any suit that is brought after a specified time since the defendant acted (such as by designing or manufacturing a

28

product), even if this period ends before the plaintiff has suffered a resulting injury."). A statute of repose "abolishes the cause of action after the passage of time even though the cause of action may not have yet accrued." Burlington, 419 F.3d at 363 (internal quotation marks omitted). Statutes of repose typically begin to run after "the occurrence of some event other than the injury which gave rise to the claim[,]" McDonald v. Sun Oil Co., 548 F.3d 774, 779 (9th Cir. 2008) (internal quotation marks omitted), such as an act by a defendant or the manufacture of a product, see Burlington, 419 F.3d at 363.

The motivations behind statutes of limitations and statutes of repose are different as well. For example, "[s]tatutes of limitations are motivated by considerations of fairness to defendants and are intended to encourage prompt resolution of disputes by providing a simple procedural mechanism to dispose of stale claims." First United Methodist, 882 F.2d at 866. Thus, they can be equitably tolled where, for example, a defendant fraudulently conceals a plaintiff's injury. Id. Statutes of repose are motivated by "considerations of the economic best interests of the public as a whole" and reflect "a legislative balance of the respective rights of potential plaintiffs and defendants struck by determining a time limit beyond which liability no longer exists." Id. Thus, unlike

statutes of limitations, statutes of repose are substantive grants of immunity from liability.  Id.

But this clear distinction between statutes of limitations and statutes of repose is of modern vintage.  Historically, the phrase "statute of repose" encompassed a broad range of time-bar statutes that limited litigation, and "provided peace, or 'repose,' to potential litigants . . . ."  Wenke v. Gehl Co., 682 N.W.2d 405, 423 (Wis. 2004); see also id. ("Early treatise writers and judges considered time bars created by statutes of limitations, escheat and adverse possession as periods of repose.  As the courts began to modify statutory limitations by applying the 'discovery rule,' legislatures responded by enacting absolute statutes of repose." (emphasis omitted) (quoting Reynolds v. Porter, 760 P.2d 816, 819–20 (Okla. 1988))).

Indeed, the earliest reference to "statutes of repose" in this circuit appears in Bartlett v. Ambrose, 78 F. 839, 842 (4th Cir. 1897), in which we cited the Supreme Court's language in Pillow v. Roberts, 54 U.S. 472, 13 How. 477 (1851), proclaiming, "[statutes of limitations] are statutes of repose, and should not be evaded by a forced construction."

Put simply, what we today would call statutes of limitations were historically considered, along with other statutory time-bars, to provide repose to litigants and were

30

thus, generally, statutes of repose. These overlapping definitions, however, have evolved into the distinct definitions we have today.

3.

"Statute of Limitations" in 1986

Using the dictionary definition of "statute of limitations" available to Congress in 1986, it is clear that there is no ambiguity as to the meaning of that term at the time § 9658 was enacted. The Fifth Edition of <u>Black's Law Dictionary</u> (the "Fifth Edition"), the most recent edition available to Congress in 1986 at the time CERCLA was amended to include § 9658, had not yet adopted the separate, modern definitions for both "statutes of limitations" <u>and</u> "statutes of repose," but was nonetheless in accord with our modern understanding where it mattered.

The Fifth Edition of <u>Black's Law Dictionary</u> defined "statute of limitations" as follows:

> A statute prescribing limitations to the right of action on certain described causes of action or criminal prosecutions; that is, declaring that no suit shall be maintained on such causes of action, nor any criminal charge be made, unless brought within a specified period of time after the right accrued. Statutes of limitation are statutes of repose, and are such legislative enactments as prescribe the periods within which actions may be brought upon certain claims or within which certain rights may be enforced. In criminal cases, however, a statute of limitation is an act of grace, a surrendering by sovereign of its

31

right to prosecute. Also sometimes referred to as "statutes of repose."

Black's Law Dictionary 835 (5th ed. 1979).[2] This definition is clearly restricted to time limitations that begin to run after the right to bring the cause of action accrues, that is, after the injury or its discovery, as opposed to after a pre-determined period of time, regardless of whether the action otherwise accrues. It, thus, confirms that statutes of limitations were but a subset of statutes of repose and were therefore "sometimes referred to as 'statutes of repose.'" Id.

Notably, this definition does not adopt the inverse proposition that all statutes of repose are also statutes of limitation. Therefore, based on the definition available to Congress at the time of the 1986 Amendments, it is clear that Congress necessarily did not intend to include statutes of repose as within the definition of "statutes of limitations."

At the time of the enactment of § 9658 in 1986, then, the only possible ambiguity may have been the meaning of "statute of repose" and whether that term had fully matured into its modern definition. But Congress chose not to include "statute of

_____

[2] As noted, we now define a statute of limitations as "[a] law that bars claims after a specified period; specif., a statute establishing a time limit for suing in a civil case, based on the date when the claim accrued (as when the injury occurred or was discovered)." Black's Law Dictionary 1546 (9th ed. 2009).

32

repose" in § 9658, and thus we need not trouble ourselves with what Congress may have thought it meant.[3]

B.

The North Carolina Statute

After discerning the plain meaning of § 9658, we must decide whether that plain meaning preempts the application of North Carolina General Statute § 1-52(16) to Appellants' state law claim. As explained, in 1986, statutes of limitations were understood to be statutes that limited the right to maintain an action based on when the injured party accrued the right. North Carolina's three-year statute of limitations is just such a restriction and is preempted by § 9658. North Carolina's 10-year statute of repose is not; therefore, it survives beyond the 1986 Amendments.

North Carolina General Statute § 1-52(16) contains both a statute of limitations and a statute of repose. The first sentence of § 1-52(16) provides a three-year statute of limitations for personal injuries and property damages based on a traditional form of the discovery rule. N.C. Gen. Stat. § 1-

---

[3] Indeed, the study group commissioned by Congress to provide recommendations for the 1986 Amendments clearly understood statutes of repose to be different and distinct from statutes of limitations, as discussed infra, and other treatises recognized the distinction at least as early as 1987. See Black's Law Dictionary 1546 (9th ed. 2009) (quoting 54 C.J.S. Limitations of Actions § 4 (1987)).

33

52(16) ("Within three years an action . . . for personal injury or physical damage to claimant's property, the cause of action . . . shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs.").

Section 1-52(16) also clearly provides a substantive 10-year statute of repose that declares "no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action." Id. § 1-52(16).

But only the three-year provision specifies a time period to bring a cause of action after the right has accrued by operation of the discovery rule. The 10-year provision specifies a time restriction regardless of whether the right to bring the cause of action could have otherwise accrued. Thus, only the former three-year provision falls within the definition of "statute of limitations" available to Congress in 1986. See Black's Law Dictionary 835 (5th ed. 1979) (defining "statute of limitations" as "[a] statute . . . declaring that no suit shall be maintained . . . unless brought within a specified period of time after the right accrued"). Therefore, only the three-year provision may be considered in order to determine North Carolina's "applicable limitations period." See 42 U.S.C.

§ 9658(b)(2) (defining "applicable limitations period" as "the period specified in a statute of limitations").

Section 9658 preempts state law where state law does not accord plaintiffs the benefit of the federally required commencement date found in § 9658(b)(4). Because North Carolina's three-year provision imposes the earlier, traditional discovery rule to commence the applicable limitations period, and not the commencement date mandated by § 9658, § 9658 preempts North Carolina's statute of limitations, but not its statute of repose.

In contrast, although § 9658 is clearly applicable to preempt the running of North Carolina's statute of limitations, any application to North Carolina's statute of repose is untenable. A simple attempt to map § 9658 onto the North Carolina statute of repose illustrates the point. To trigger § 9658(a)(1), the state "commencement date" must be "earlier than the federally required commencement date." 42 U.S.C. § 9658(a)(1) ("[I]f the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date . . . ."). Importantly, the commencement date is defined as the beginning of the period in which a civil action may be brought. See id.

35

§ 9658(b)(2)-(3).[4] But the North Carolina statute of repose does not provide a beginning or "commencement date" as that term is defined. Rather, it provides an outer limit, after which no cause of action may accrue. Because North Carolina's statute of repose does not create the beginning of the applicable limitations period, § 9658 cannot graft neatly -- or at all -- onto the North Carolina statute of repose so as to preempt its enforcement.

## C.

### Legislative History

Given the plain meaning of the statute, we need not look to legislative history. But, even if we did, the legislative history of § 9658 also clearly supports the conclusion that Congress was aware that statutes of limitations were a distinct category of time-bar statutes and specifically chose only to preempt those statutes and not other statutory time bars such as statutes of repose.

As a part of the initial enactment of CERCLA in 1980, Congress commissioned a study group of expert lawyers "to determine the adequacy of existing common law and statutory

---

[4] The North Carolina statute of limitations establishes the beginning of that period as the point at which "bodily harm . . . or physical damage . . . becomes apparent or ought reasonably to have become apparent . . . ." N.C. Gen. Stat. § 1-52(16).

remedies in providing legal redress for harm to man and the environment caused by the release of hazardous substances into the environment . . . ." CERCLA, Pub. L. No. 96–510, § 301(e)(1), 94 Stat. 2767 (1980). The study group responded with a detailed report and recommendations for improving remedies under CERCLA. See Superfund Section 301(e) Study Group, 97th Cong., Injuries and Damages from Hazardous Wastes–– Analysis and Improvement of Legal Remedies (Comm. Print 1982) (the "301(e) Report").

The 301(e) Report contained ten categories of recommendations, the ninth of which included recommendations for "Statutes of Limitations." The 301(e) Report outlined the rationale for implementing an enhanced discovery rule in CERCLA actions, id. at 28–30, and provided its recommendation, id. at 240–41. The 301(e) Report's recommendation with regard to statutes of limitations, in its entirety, was as follows:

> A small number of states still follow the so-called traditional rule that the cause of action accrues from the time of exposure. Another small number of states has not as yet clearly adopted either the traditional or the discovery rule. Since many of the hazardous wastes are carcinogens, mutagens, teratogens or substances with delayed impact on different organs or the central nervous system, the latency period for the appearance of injury or disease is likely to be extended for thirty years or more. In states that have not clearly adopted the discovery rule (i.e., that the cause of action accrues from the time the plaintiff discovered or reasonably should have discovered the injury or disease) the cause of action will usually be time barred when the plaintiff

37

> discovers his hurt.  The Study Group recommends that all states that have not already done so, clearly adopt the rule that an action accrues when the plaintiff discovers or should have discovered the injury or disease and its cause.  The Recommendation is intended also to cover the repeal of the statutes of repose which, in a number of states have the same effect as some statutes of limitation in barring plaintiff's claim before he knows that he has one.

Id.

Two key takeaways can be culled from the 301(e) Report's recommendation: (1) an enhanced discovery rule should apply to statutes of limitations; and (2) statutes of repose are separate and distinct from statutes of limitations.

First, the 301(e) Report clearly informed Congress that an enhanced discovery rule should apply to statutes of limitations in all states for injuries caused by hazardous substances.  In essence, the 301(e) Report took the position that a plaintiff's statute of limitations should not begin to run until the plaintiff both discovers or should have discovered the injury, and realizes that his or her injury was caused by the hazardous substance.  301(e) Report at 241 ("The Study Group recommends that all states that have not already done so, clearly adopt the rule that an action accrues when the plaintiff discovers or should have discovered the injury or disease and its cause.").  Congress agreed.  In enacting § 9658, Congress implemented this exact formulation of the discovery rule in its definition of the

38

"federally required commencement date." 42 U.S.C. § 9658(b)(4)(A).[5]

Second, the 301(e) Report put Congress on notice that statutes of limitations are distinct time-bars, separate from statutes of repose, even if they have the same effect. The 301(e) Report recommended to Congress not only that the aforementioned enhanced discovery rule should be applied to state statutes of limitations, but also recommended that state statutes of repose be repealed. 301(e) Report at 241 ("The Recommendation is intended also to cover the repeal of the statutes of repose which, in a number of states have the same effect as some statutes of limitation in barring plaintiff's claim before he knows that he has one."). By the plain language of § 9658, Congress disagreed.

Based on the 301(e) Report, Congress was clearly on notice that statutes of repose, separate and distinct from statutes of limitations, could prohibit recovery by certain plaintiffs, and yet chose to leave § 9658 completely replete of any reference to such statutes.

---

[5] The "federally required commencement date" is defined, in relevant part, as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A).

D.

Legislative Compromise

The majority notes that CERCLA is a remedial statute and thus deserves broad construction to accomplish its objectives. Ante at 17. This is true. But the plain meaning of the statute and the role of legislative compromise restrain the application of the remedial canon of statutory interpretation. See 3550 Stevens Creek Assocs. v. Barclays Bank of Cal., 915 F.2d 1355, 1363 (9th Cir. 1990) (noting that even if courts give CERCLA a "broad interpretation to accomplish its remedial goals[,]" courts must nonetheless "reject a construction that [CERCLA] on its face does not permit, and the legislative history does not support."); Blake A. Watson, Liberal Construction of CERCLA under the Remedial Purpose Canon: Have the Lower Courts Taken a Good Thing too Far?, 20 Harv. Envtl. L. Rev. 199, 300–01 (1996) ("It has been firmly established that the fact that a statute is 'highly remedial in nature' and 'entitled to a liberal construction' nevertheless 'does not justify ignoring plain words of limitation.'") (quoting MacEvoy Co. v. United States, 322 U.S. 102, 107 (1944)); id. at 301 ("[T]he remedial purpose canon has diminished utility when the interpretive issue focuses on provisions of CERCLA that are the product of compromise.

Such compromises can be found in both CERCLA's text and its enactment history.").[6]

In passing the 1986 Amendments, Congress did not arm toxic tort plaintiffs with every possible advantage nor remove every obstacle from their path to recovery. Rather, the 1986 Amendments reflected the process of legislative compromise based, in part, on the 301(e) Report's analysis and recommendations. As mentioned, the 301(e) Report was commissioned to evaluate existing statutory and common law remedies for environmental harms caused by hazardous substances and to provide corresponding recommendations. CERCLA, Pub. L. No. 96-510, § 301(e)(1), (4), 94 Stat. 2767 (1980).

But Congress did not implement every recommendation supplied by the 301(e) Report. In fact, quite to the contrary. For example, in its "Ninth Recommendation," the 301(e) Report recommended a variety of changes to actions arising under state law. 301(e) Report, 240–51. The 301(e) Report recommended states adopt an enhanced discovery rule, id. at 241; repeal statutes of repose, id.; adopt liberal joinder rules for

---

[6] Even if CERCLA, as enacted in 1980, was the product of an 11th-hour compromise and, thus, also lends itself to a liberal construction for that reason as the majority seems to imply, ante at 4, 17–19, the provision at issue in this case, § 9658, was passed years later in 1986 after careful study and deliberation. The circumstances surrounding § 9658's passage certainly do not invite departure from its plain language.

plaintiffs, id. at 242; adopt a system of joint and several liability with a de minimis exception, id. at 243; adopt liberal joinder rules for defendants, id. at 244; implement their own evidentiary presumptions, id. at 245; and adopt a theory of strict liability for hazardous waste activities, id. at 245. Congress could have drafted the 1986 Amendments to implement any or all of the 301(e) Report's recommendations by preempting state law wherever it fell short of the 301(e) Report's recommendations. But the only revision affecting state law Congress chose to implement in the section explicitly covering state procedural reform was the enhanced discovery rule via the federally required commencement date. See 1986 Amendments, Pub. L. No. 99-499, § 203, 100 Stat. 1613 (1986). Notably, Congress was given the opportunity to repeal statutes of repose, but chose not to.

That § 9658 reaches state statutes of limitations but not statutes of repose strikes a balance between harmonizing certain procedural matters in toxic tort cases and allowing states to continue to regulate their own substantive areas of law. It is the prerogative of Congress to strike that balance. See Hanford Downwinders Coalition, Inc. v. Dowdle, 71 F.3d 1469, 1484 (9th Cir. 1995) (concluding that even when the application of a CERCLA provision leads to "harsh results[,]" courts should not disrupt Congress's balancing of the interests involved).

42

E.

Presumption Against Preemption

While at its most elemental this case concerns a matter of statutory interpretation, that task arises in the context of federal preemption. "Courts generally apply a presumption against preemption in fields the states traditionally regulate." Nat'l City Bank of Ind. v. Turnbaugh, 463 F.3d 325, 330 (4th Cir. 2006). Just as we presume "Congress does not cavalierly pre-empt state-law causes of action[,]" Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996), we should also presume that Congress does not cavalierly preempt state substantive rights to be free from those state-law causes of action. Even "[f]ederal laws containing a preemption clause[,]" such as § 9658, "do not automatically escape the presumption against preemption." Id. Rather, "[w]here the text of a preemption clause is open to more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" Id. at 335 (quoting Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005)).

Here, the ability of a state to create a substantive right to be free from liability under its own state tort law is unquestionably a traditional field of state regulation. Therefore, the general presumption against preemption likewise weighs against giving § 9658 overly broad preemptive effect. See Barnes ex rel. Barnes v. Koppers, Inc., 534 F.3d 357, 363

43

(5th Cir. 2008) (discussing the preemptive effect of § 9658 and noting that "[i]f the extent of Congress's preemptive intent is unclear, the presumption favors a finding of limited preemption."); see generally Marsh v. Rosenbloom, 499 F.3d 165, 178 (2d Cir. 2007) (concluding CERCLA did not preempt certain Delaware statutes in part because arguments in favor of greater monetary recovery "alone are insufficient to justify displacement of state law").

## II.

CERCLA and the 1986 Amendments clearly put a thumb on the scales in favor of assisting plaintiffs who may have suffered injuries due to toxic substances. But where Congress by plain and unambiguous language has indicated how much pressure it wishes to apply in that regard, it is not the duty of this court to press harder and shift that balance. Rather, it is the prerogative of Congress to strike that legislative compromise.

In sum, because I believe the plain language of § 9658 preempts North Carolina's statute of limitations, but not its statute of repose, I would affirm the decision of the district court.

44